**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 18-CR-80166-DMM**

UNITED STATES OF AMERICA
           Plaintiff,
v.

NICHOLAS WUKOSON,
           Defendant.
_____/

## <u>MOTION TO SUPPRESS SEARCH WARANT</u>

COMES NOW, the Defendant, NICHOLAS WUKOSON, who respectfully requests that this Honorable Court convene a hearing and thereafter suppress the fruits of a search warrant executed on December 4, 2017, upon the residence of the Defendant NICHOLAS WUKOSON at 807 University Boulevard, Apartment 10 Jupiter, Florida. As grounds therefore undersigned counsel would state the following:

<u>STATEMENT OF FACTS</u>

On December 4, 2017, Federal Agents executed a search warrant on the Defendant's premises based upon sworn allegations that the IP address attributable to one of the defendant's computers was located at the above address. Based upon surveillance and other investigatory leads, the Defendant, was believed to reside at that above address. The search was also based upon the assertion that the owner of this computer was accessing child pornography from a Peer to Peer (P2P) file sharing network used to share files of child pornography. Once the search warrant was executed, the agents also recovered a computer in the hallway closet of the Defendant. This computer was black in color and will be referred to as the older computer. The newer computer was silver in color and will be referred as the new computer. Also, recovered in the search were a hard drive, two cellular telephones, and an iPad.

Ultimately, the Defendant was charged in a Superseding Indictment with six counts of Possession of Child Pornography; Trial in this matter is set for March 25, 2019.

## THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT

The Affidavit in support of the search warrant (Exhibit A) in pertinent part alleged as follows:

"IV Background of the investigation

17. On September 25, 2017, law enforcement, while working in an undercover capacity, was signed into the internet through a computer located in the Miami Division of the FBI. Law enforcement utilized an enhanced version of a publicly available P2P file sharing program (Bit Torrent) to identify individuals sharing images and/or videos which depicted the sexual exploitation of children.

18. During the investigation, a computer was identified on the BitTorrent client P2P file sharing network that was associated with a torrent file believed to contain files that depict child pornography. Specifically, IP address 75.74.212.126 (hereinafter referred to as "Target IP address") was listed as utilizing Bit Torrent and sharing files with hash values of images and videos of suspected child pornography.

19. On September 25, 2017, law enforcement successfully completed the download of several video files depicting child pornography that the computer at the Target IP address was making available.

20. Law enforcement reviewed all of the files. It was determined that all of the files depicted children under the age of 18 years (18) engaged in sexual acts/or poses consistent with child pornography. A sample of three (3) of the files download are described as follows:

A) File name: (Pthc) 10 yo Irisa.Anal.mpg

This video depicts a prepubescent female on all fours with what appears to be the hands of an adult male touching the girl's anus and vagina with an unknown object. The video transitions to what appears to be the same prepubescent girl laying naked on a bed playing with and fondling her vagina, with the camera zooming in on her vaginal area. The third position, the video shows an adult male penetrating a prepubescent girl with his penis while the girl is on all fours and then while the adult male is laying down.

B) File name: (Pthc) Lily 10 Yo Takes it Fully-8m39S.avi

This video depicts an adult male digitally and orally penetrating a prepubescent female's vagina and then the adult male has vaginal sex with the juvenile female.

C) File name: Russian Lolita 13 yp-SaMix (PTHC)(R@ygold).mpg

This video is a compilation that depicts a kneeling juvenile female manually stimulating a standing adult male; a prepubescent female performing oral and digital sex on an adult male; a prepubescent female and an adult male laying on a bed having vaginal sex; an adult male digitally and orally penetrating a prepubescent female's vagina and then the adult male has vaginal sex with the juvenile female; a prepubescent female sitting naked on top of a naked adult male while manually stimulating his erect penis."

These statements were in fact false.

After the defendant was indicted, the defense hired a forensic expert Richard Connor

(who is the subject of a separate expert disclosure today).

Mr. Connor analyzed both the old and new computer, as well as the logs associated with

these devices, to reach the conclusions which refute the veracity of the assertions made above.

Mr. Connor made the following findings:

- The old computer was last used on February 1, 2017.

- "There were six download sessions on September 25, 2017. I reviewed the logs for all six sessions.

    The logs show that:

    o (Pthc) 10 Yo Irisa - anal mpg was partially downloaded, not successfully downloaded. 31225728 of 182220672 bytes were downloaded, which means only 17.4% of the video      was downloaded.

    o (Pthc) Lily 10 Yo takes it fully- 8m39S.avi was successfully downloaded.

    o Russian Lolita 13 YoSaMix (PTHC)(R@ygold).mpg was partially downloaded, not successfully downloaded. 53895422 of 71968772 bytes were downloaded, which means only 7.57% of the video was downloaded.

I did not see any evidence indicating that any of these three files had been on the new computer. These files were on the old computer."

Obviously, the fact that the old computer had not been used since February 1, 2017, further destroys the veracity of the assertions contained in the above affidavit.

Moreover, there is no factual support for the search warrant affidavit's assertion that Law Enforcement successfully completed the download of the above videos on September 25, 2017.

Mr. Connor's additional findings, also destroys any possible argument that other files were successfully downloaded by the FBI between June 24, 2017 and August 23, 2017 (See Exhibit B attached hereto).

Mr. Connor found the following regarding the undercover download logs for this period of time:

- "I examined the undercover torrent download logs provided by the government. They show 96 download sessions between June 27 and November 26, 2017. I do not recall another case where there were more than a few (1, 2 or 3) download sessions. In most cases, the agent tries to do a download, and then gets a search warrant whether or not the download was successful. In this case, the first of 96 download sessions was successful, the blog shows that a cp[1] video, 'bd-company full (Series 1 of beautiful pretty TANYA). wmv', was completely downloaded. I do not know why there were 95 additional download sessions. I did not find any evidence that this file was on the computer.

- In a typical torrent case, it is my experience that the agent searches for known cp torrent, finds an IP address within his jurisdiction, and then attempts a single source download from the target at the IP address. This is the method I usually see in the cases I have handled. It is my understanding; the undercover software can search for only one torrent at a time. I also understand that law enforcement has a database of thousands of torrents that it claims contain cp. It seems highly unlikely, that the agent in this case searched for a specific cp torrents from amongst the thousands available, and got 96 hits from the same ip address.

- It may be possible, that the undercover software can be set up to monitor an IP address and attempt a download whenever the IP address is online and sharing torrents. If this occurred in this case, there should be some record of how and when

---

[1] Cp refers to Child Pornography.

the IP address was first identified as having cp, and I have not seen any record of that in this case."

In short, there is no factual support for the alleged assertions contained in either, the search warrant in this case, nor the other evidence gleaned from the FBI's investigation in this matter.

## MEMORANDUM OF LAW

In *Franks v Deleware*, 438 US 154 (1978), the Supreme Court considered the issue of whether a defendant in a criminal proceeding has the right, under the Fourth and Fourteenth Amendments, to challenge the truthfulness of factual statements made in the affidavit supporting a search warrant. The Court held that where a Defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement in reckless disregard of its truth, and the false statement was necessary to the finding of probable cause then constitutional mandate requires that a hearing be held at the Defendant's request. There must be a preliminary showing that a material omission or false statement can be proven, not a mere allegation or an unsupported request for hearing. *United States v Barsoum*, 763 F.3d 1321, 1329 (11th Cir. 2014); insignificant and immaterial representations or omissions will not invalidate a warrant. *United States v Reid*, 69 F.3d 1109 (11th Cir. 1995); *United States v Glinton*, 154 F.3d 1245 (11th Cir. 1998); *United States v Jenkins*, 901 F.2d 1075 (11th Cir. 1990); *United States v Abolaez*, 450 F3d 1283,1294 (11th Cir. 2006); *United States v Kapordelis*, 569 F.3d 1291,1308-1310 (11th Cir. 2009).

If the Defendant shows that there are misrepresentations in a search warrant affidavit then the court must decide whether, not including the false information (and including any omitted favorable information), there was still probable cause to search the location; *United States v*

*Cross*, 928 F.2d 1030 (11th Cir 1991); *United States v Weber*, 808 F.2d 1422 (11th Cir. 1987);

*United States v Kirk* , 781 F.2d 1498 (11th Cir. 1986); *United States v. Kapordelis*, 569

F.3d  1291, 1308-1310 (11th Cir 2009); and *Untied States v Gamory*, 635 F.3d 480 (11th Cir

2011).

   Here, the Defendant has made the substantial preliminary showing that the affiant made a

knowing and intentional false statement in the affidavit or a statement in reckless disregard of the

truth, without which the Government cannot demonstrate probable cause for this search. Thus, a

hearing is necessary, which the defense requests this Honorable Court to convene. This is much

more than an unsupported and insignificant or immaterial representation.

   Finally, even including any omitted favorable information (see exhibit B), the affidavit

and supporting evidence fails to supply the probable cause necessary to support this search

warrant.

   FOR THE FOREGOING reasons, this Honorable Court should convene a hearing, take

testimony, and thereafter suppress the search warrant in this case.

Dated: March 13, 2019

          Respectfully submitted,

          **Michael B. Cohen, Esq.**
          *Michael B. Cohen*
          Michael B. Cohen, Esq.
          Attorney for Defendant Nicholas Wukoson
          Florida Bar No:  210196
          6400 North Andrews Ave., Ste 505
          Fort Lauderdale, Florida 33309
          Ph (954) 928-0059
          Email: Mcohenlaw@aol.com

# Exhibit A

FD-302 (Rev. 5-8-10)

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    09/01/2017

On August 31, 2017, OCE Symbol 7113, while working in an undercover
capacity, was signed into the internet through a computer located in the
Miami Division of the Federal Bureau of Investigation (FBI).  OCE Symbol
7113 utilized an enhanced version of a publicly available peer to peer
(P2P) file sharing program (BitTorrent) to identify individuals sharing
images or videos which depicted the sexual exploitation of children.

Session Summary:

UMM Session:          UMM982

Date of Session:      June 24, 2017 to August 23, 2017

Identified IP Address:   75.74.212.126

On the above dates, OCE Symbol 7113 successfully completed the download of
several file(s) that the computer at IP address 75.74.212.126 was making
available.  Some of the files were downloaded in full, partial and some
files did not download.  The files that were downloaded by OCE 7113 were
only downloaded from the computer at IP Address 75.74.212.126.

A review of the files downloaded, revealed that the files were images of
child pornography.  The files downloaded along with the log files were
placed on a hard drive and held as evidence.

Investigation on   08/31/2017    at   Miramar, Florida, United States (, Other (Computer))

File #  305A-MM-106870                              Date drafted  08/31/2017

by  OCE-7113

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

# Exhibit B

AO 106 (Rev. 04/10)  Application for a Search Warrant

## UNITED STATES DISTRICT COURT

FILED BY _____ D.C.

for the

Southern District of Florida

NOV 3 0 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA - W.P.B.

In the Matter of the Search of          )
*(Briefly describe the property to be searched*          )
*or identify the person by name and address)*          )
          )          Case No.  17-8504-JMH
807 University Boulevard, Apartment 104, Jupiter,          )
Florida, 33458          )
          )

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized):*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Sec. 2252A | Distribution, Receipt, Possession of Child Pornogarphy |

The application is based on these facts:

☐ Continued on the attached sheet.

☑ Delayed notice of ___30___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA SCOTT WILSON, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____11/30/2017____

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
- U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date ___11/30/17___

_____
*Judge's signature*

City and state: ____West Palm Beach, FL____          U.S. Magistrate Judge James M. Hopkins
*Printed name and title*

United States v. Wukoson, 18-CR-80166-Middlebrooks, Bates Number 0008

## ATTACHMENT A

## DESCRIPTION AND PHOTOGRAPHS OF PLACE TO BE SEARCHED

The Target Premises, including any and all computers, electronic mobile devices and electronic storage media found therein, located at **807 University Boulevard, Apartment 104, Jupiter, Florida, 33458**. Target Premises is a three story tan, white and grey structure. The building contains a sign which is written "The Sophia Abacoa/Building 1900" and another one which is written "The Sophia Abacoa/807 University Blvd". The Target Premises is located on the southern end of the building. The front door is painted green and the address "104" is located on the upper right side. The door faces a northeasterly direction.



**ATTACHMENT B**

**Particular Things to be Seized**

The following items to be seized constitute contraband, fruits, instrumentalities, and evidence of crimes, to wit: violations of Title 18, United States Code, Section 2252A (possession, receipt, transportation, and distribution of child pornography,):

1.     Child pornography;

2.     Visual depictions of minors engaged in sexually explicit conduct;

3.     Information, correspondence, records, or other materials constituting evidence of or pertaining to child pornography and visual depictions of minors engaged in sexually explicit conduct, or constituting evidence of or pertaining to the receipt, distribution, or transmission through interstate or foreign commerce of items "1" and "2" above, or constituting evidence of or pertaining to an interest in child pornography or sexual activity with children, including:

      a.     Correspondence or communications, such as electronic mail, chat logs, and electronic messages;

      b.     Internet usage records, user names, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, accounts, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files;

      c.     Diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the computer and internet websites;

      d.     Shared images, "friends lists" and "thumbnails"; and

      e.     Financial records, including credit card information.

4.     The items listed in "1" through "3" above may be seized in whatever form, visual

or aural, and by any means by which they may have been created, stored, or found, including:

    a.    Any computer, computer hardware (including input/output peripheral devices), computer software, router, computer-related documentation, related peripherals, and digital cameras, including:

        i.tapes, tape systems, and tape drives, cassettes, disks, disk drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks;

        ii.hard drive and other computer related operation equipment;

        iii.monitors, printers, modems, scanners;

        iv.hardware and software manuals, passwords, data security devices;

        v.related documentation;

    b.    Handmade form, including writings, drawings, paintings;

    c.    Photographic form, including microfilm, microfiche, prints, slides, motion picture, films, videos and photocopies;

    d.    Graphic interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such graphic interchange formats (including but not limited to JPG, GIF, TIF, AVI, MPG, and MPEG);

    e.    Mechanical form, including books, magazines, printing and typing;

    f.    Electrical, electronic or magnetic form, including

        i.tape recordings, cassettes, compact disks, backup tapes;

        ii.electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMS, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multimedia Cards (MMCs), memory sticks, flash memory devices, optical disks, smart cards, or electronic notebooks; cellular phones, smart phones, smart televisions, iPods, online gaming systems (i.e.

xBox, PlayStation), smart watches, tablets; and

             iii. digital data files, printouts or readouts from any magnetic, electrical or electronic storage device;

      g.     Originals, photocopies, other copies and negatives; and

      h.     Coping digital evidence stored on a server (s) in another location, including cloud storage, if the server can be remotely accessed from a computer(s) located at the site authorized to be searched by the approval of this court order which gives law enforcement the ability to preserve the integrity of the evidence and prevent it from being tampered with or destroyed.; and

     5.     Records or documents evidencing occupancy or ownership of the car, including utility and telephone bills, mail envelopes, or addressed correspondence.

     6.     Records or documents evidencing ownership or use of computer equipment found in the car, including sales receipts, bills for Internet access, and handwritten notes.

     7.     For any digital device or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant:

      1.     evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      2.     evidence indicating how and when the digital devices was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

3.      evidence indicating the digital devices user's state of mind as it relates to the crime under investigation;

4.      evidence of the attachment to the digital devices of other storage devices or similar containers for electronic evidence;

5.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital devices;

6.      evidence of the times the digital devices was used;

7.      passwords, encryption keys, and other access devices that may be necessary to access the digital devices;

8.      documentation and manuals that may be necessary to access the digital devices or to conduct a forensic examination of the digital devices;

9.      information about internet protocol addresses used by the digital devices;

10.     records of or information about the digital device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms entered into Internet search engines, and records of user-typed web addresses;

11.     Routers, modems, and network equipment used to connect to the Internet.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### I.   AFFIANT'S BACKGROUND

I, Scott Wilson, having been first duly sworn, do hereby depose and state as follows:

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2002.  I am currently assigned to the Miami Field Office, Palm Beach County Resident Agency, violent crimes squad, which investigates all manners of violent crimes, including the online sexual exploitation of children.  As part of my duties, I investigate crimes involving the sexual exploitation of minors including the production, possession, and distribution of child pornography.  I received training on the proper investigative techniques for these violations, including the use of surveillance techniques, undercover activities, and the application and execution of arrest and search warrants.  I have conducted and assisted in several child exploitation investigations, and have executed search warrants that have led to seizures of child pornography.

2.       This affidavit is made in support of an application for a warrant authorizing the search of a residence located at **807 University Boulevard, Apartment 104, Jupiter, Florida, 33458** (hereinafter, the "Target Premises"), as more particularly described in Attachment A of this affidavit, and any computers and electronic mobile devices and electronic storage media found therein.

3.       Based on the information set forth in this affidavit, there is probable cause to believe that at the Target Premises there exist fruits, instrumentalities, and evidence of the possession, receipt, transportation, and distribution of child pornography, in violation of Title 18, United States Code, Section 2252.  I am requesting authority to search the entire Target Premises, including the residential dwelling, any storage unit assigned to that dwelling, any computers or electronic media,

any electronic mobile devices used to access the Internet, and any electronic storage media stored therein, for the items specified in Attachment B, hereto, which items constitute fruits, instrumentalities, and evidence of the foregoing violations.

4.     Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation.  I have included only those facts and circumstances that I believe are sufficient to establish probable cause for the issuance of the requested search warrant.

5.     The statements contained in this affidavit are based upon my investigation, information provided by other sworn law enforcement officers and other personnel specially trained in the seizure and analysis of computers and electronic mobile devices and electronic storage devices, and on my experience and training as a federal agent.

## II. STATUTORY AUTHORITY

6.     Title 18, United States Code, Section 2252(a) prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, or possessing any visual depiction of minors engaging in sexually explicit conduct when such visual depiction was either mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or when such visual depiction was produced using materials that had traveled in interstate or foreign commerce.

## III.     PEER-TO-PEER FILE SHARING ON THE BITTORRENT NETWORK

7.     Millions of computer users throughout the world use peer-to-peer (P2P) file sharing networks to share files containing music, graphics, movies and text.  These networks have also become a popular way to download and distribute child pornography.  Any computer user who

can connect to the internet can download P2P application software, which is typically free, and use it to share files through a P2P network.

8.      The BitTorrent network is a very popular and publically available P2P file sharing network.  Most computers that are part of this network are referred to as "peers" or "clients".  A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients.

9.      The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, examples of which include the BitTorrent client program, uTorrent client program, and Vuze client program, among others.  These client programs are publically available and typically free P2P client software programs that can be downloaded from the Internet.

10.     During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files via automatic uploading[1].  Typically, as users download files or pieces of files from other peers/clients on the BitTorrent network, other users (peers/clients) on the network are able to download the files or

---

[1] As an example, during the downloading and installation of the publically available uTorrent client program, the license agreement for the software states the following: "Automatic Uploading.  uTorrent accelerates downloads by enabling your computer to grab pieces of files from other uTorrent or BitTorrent users simultaneously.  Your use of the uTorrent software to download files will, in turn, enable other users to download pieces of those files from you, thereby maximizing download speeds for all users.  In uTorrent, only files that you are explicitly downloading or sharing (seeding) will be made available to others.  You consent to other users' use of your network connection to download portions of such files from you.  At any time, you may uninstall uTorrent through the Add/Remove Programs control panel utility.  In addition, you can control uTorrent in multiple ways through its user interface without affecting any files you have already downloaded, thereby maximizing download speeds for all users.

pieces of files from them, a process which maximizes the download speeds for all users on the network. Once a user has completed the download of an entire file or files, they can also continue to share the file with individuals on the BitTorrent network who are attempting to download all pieces of the file or files, a process referred to as "seeding".

11.     Files or sets of files are shared on the BitTorrent network via the use of "Torrents". A "Torrent" is typically a small file that *describes* the file(s) to be shared. It is important to note that "Torrent" files do not contain the actual file(s) to be shared, but information about the file(s) to be shared needed to accomplish a download. This information includes things such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent". The "info hash" is a SHA-1[2] hash value of the set of data describing the file(s) referenced in the "Torrent". This set of data includes the SHA-1 hash value of each file piece in the torrent, the file size(s), and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers". "Trackers" are computers on the BitTorrent network that collate information about

---

[2]The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), as a means of identifying files using a digital "fingerprint" that consists of a unique series of letters and numbers. The United States has adopted the SHA1 hash algorithm described herein as a Federal Information Processing Standard. SHA-1 is the most widely used of the existing SHA hash functions, and is employed in several widely used applications and protocols. A file processed by this SHA1 operation results in the creation of an associated hash value often referred to as a digital signature. SHA1 signatures provide a certainty exceeding 99.99% that two or more files with the same SHA1 signature are identical copies of the same file regardless of their file names.

the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referenced in the "Torrent". "Trackers" do not actually have the file(s) but are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent" file. There are many publically available servers on the Internet that provide BitTorrent tracker services.

12.    In order to locate "Torrent" files of interest and download the files that they describe, a typical user will use keyword searches on torrent indexing websites, examples of which include *isohhunt.com* and the *piratebay.org*. Torrent indexing websites are essentially search engines that users on the BitTorrent network use to locate "Torrent" files that describe the files they are looking to download. Torrent indexing websites do not actually host the content (files) described by "Torrent" files, only the "Torrent" files themselves. Once a "Torrent" file is located on the website that meets a user's keyword search criteria, the user will download the "Torrent" file to their computer. The BitTorrent network client program on the user's computer will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on

SHA-1 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent", to include the remote peers/clients Internet Protocol (IP) addresses.

13.    For example, a person interested in obtaining child pornographic images or videos on the BitTorrent network can go to a torrent indexing website and conduct a keyword search using a term such as "preteen sex" or "pthc" (pre-teen hardcore). The results of the keyword search are typically returned to the user's computer by displaying them on the torrent indexing website. Based on the results of the keyword search, the user would then select a "Torrent" of interest to them to download to their computer from the website. Typically, the BitTorrent client program will then process the "Torrent" file. Utilizing trackers and other BitTorrent network protocols, peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referenced in the "Torrent" file available for sharing. The file or files are then downloaded directly from the computer(s) sharing the file or files. Typically, once the BitTorrent network client has downloaded part of a file or files, it may immediately begin sharing the part of the file or files it has with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 hash value of that piece which is described in the "Torrent" file. The downloaded file or files are then stored in an area (folder) previously designated by the user and/or the client program on the user's computer or designated external storage media. The downloaded file or files, including the torrent file, will remain in that location until moved or deleted by the user.

14.    Law Enforcement can search the BitTorrent network in order to locate individuals sharing previously identified child exploitation material in the same way a user searches this network. To search the network for these known torrents can quickly identify targets in their jurisdiction. Law Enforcement receives this information from "Trackers" about peers/clients on

the BitTorrent network recently reporting that they are involved in sharing digital files of known or suspected child pornography, based on "info hash" SHA-1 hash values of torrents. These torrents being searched for are those that have been previously identified by law enforcement as being associated with such files. There are BitTorrent network client programs which allow for single-source downloads from a computer at a single IP address, meaning that an entire file or files are downloaded only from a computer at a single IP address as opposed to obtaining the file from multiple peers/clients on the BitTorrent network. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known or suspected child pornography on the BitTorrent network.

15.     During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between the investigator's BitTorrent client program and the suspect client program they are querying and/or downloading a file from. This information includes 1) the suspect client's IP address; 2) a confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is being reported as shared from the suspect client program; and 3) the BitTorrent network client program and version being utilized by the suspect computer, all of which information has the ability to be logged by law enforcement.

16.     The investigation of peer-to-peer file sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes against Children Task Force Program. P2P investigative methodology has led to the issuance and execution of search warrants around the country resulting in the arrest and conviction of numerous offenders possessing and/or distributing child pornography, some of which were also involved in the sexual exploitation of actual child victims.

## IV.   BACKGROUND OF THE INVESTIGATION

17.   On September 25, 2017, law enforcement, while working in an undercover capacity, was signed into the internet through a computer located in the Miami Division of the FBI. Law enforcement utilized an enhanced version of a publicly available P2P file sharing program (BitTorrent) to identify individuals sharing images and/or videos which depicted the sexual exploitation of children.

18.   During the investigation, a computer was identified on the BitTorrent client P2P file sharing network that was associated with a torrent file believed to contain files that depict child pornography. Specifically, IP address **75.74.212.126** (hereinafter referred to as "Target IP Address") was listed as utilizing BitTorrent and sharing files with hash values of images and videos of suspected child pornography.

19.   On September 25, 2017, law enforcement successfully completed the download of several video files depicting child pornography that the computer at the Target IP Address was making available.

20.   Law enforcement reviewed all of the files. It was determined that all of the files depicted children under the age of eighteen (18) engaged in sexual acts and/or poses consistent with child pornography. A sample of three (3) of the files downloaded are described as follows:

A)   File name: (Pthc) 10yo Irisa-Anal.mpg

This video depicts a prepubescent female on all four's with what appears to be the hands of an adult male touching the girl's anus and vagina with an unknown object. The video transitions to what appears to be the same prepubescent girl laying naked on a bed playing with and fondling her vagina, with the camera zooming in on her vaginal area. The third portion

of the video shows an adult male penetrating a prepubescent girl with his penis while the girl is on all fours and then while the adult male is laying down.

B)   File name: (Pthc) Lily 10Yo Takes It Fully – 8m39S.avi

This video depicts an adult male digitally and orally penetrating a prepubescent female's vagina and then the adult male has vaginal sex with the juvenile female.

C)   File name: Russian Lolita 13yp- SaMix (PTHC)(R@ygold).mpg

This video is a compilation that depicts a kneeling juvenile female manually stimulating a standing adult male; a prepubescent female performing oral and digital sex on an adult male; a prepubescent female and an adult male laying on a bed having vaginal sex; an adult male digitally and orally penetrating a prepubescent female's vagina and then the adult male has vaginal sex with the juvenile female; a prepubescent female sitting naked on top of a naked adult male while manually stimulating his erect penis.

21.      A search of a publicly available online database indicated that the Target IP Address **75.74.212.126** was registered to Comcast.   Results from an administrative subpoena sent to Comcast for the date the files were downloaded revealed the Target IP Address was assigned to an account registered to an individual with the initials "N.W." at the Target Premises.

22.      On November 13, 2017, a representative of The Sophia Abacoa apartment complex was contacted.  The representative verified that tenant N.W. has lived at the Target Premises since approximately May 2016.

23.     On November 13, 2017, law enforcement conducted physical surveillance at the Target Premises. At approximately 4:21 p.m., a black Ford Fusion bearing Florida license plate B4FGM was observed in the parking lot outside of the Target Premises. The vehicle is registered to N.W.

24.     A search of the State of Florida Driver and Vehicle Information Database (DAVID) for the Target Premises revealed the subscriber "N.W." has the Target Premises as the address of record and one other record of an adult male with the initials "A.E." who listed the Target Premises as the address of record in 2008.

## V.     DEFINITIONS

25.     The following definitions apply to this Affidavit and Attachment B to this Affidavit:

a.      "Child Pornography," as used herein, includes the definition in Title 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct (see Title 18 U.S.C. §§ 2252 and 2256(2)).

b.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See Title 18 U.S.C. § 2256(5).

c.      "Sexually explicit conduct" means actual or simulated (a) sexual

intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

      d.    "Computer," as used herein, is defined pursuant to Title 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      e.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      f.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

      g.    "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure

or use computer hardware, computer software, or other related items.

      h.     "Computer passwords and data security devices," as used herein, consists of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      i.     The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

      26.     Because of their similar capabilities, cellular phones, smart phones, smart televisions, iPods, online gaming systems (i.e. xBox, Playstation), smart watches, and tablets have

the same capabilities as computers in so far as they connect to the internet and store media, they are considered in the same manner as "computers" above.

## VI.    CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

27.    Through my experience and training, and that of other FBI Special Agents, the following traits and characteristics are generally found to exist and be true in cases involving individuals who collect child pornography:

a.    The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b.    The majority of individuals who collect child pornography often seek out likeminded individuals, either in person or on the internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different internet based vehicles used by such individuals to communicate with each other include, but are not limited to, websites, email, email groups, bulletin boards, internet chat programs, newsgroups, instant messaging, and other similar vehicles.

c.    The majority of individuals who collect child pornography often collect, read, copy, or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely

on scraps of paper.

    d.    Many individuals who collect and produce child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage.  These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other likeminded individuals over the Internet.  As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations.  Based on my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who produce, possess, receive, and/or distribute child pornography by digital devices using the Internet often maintain and/or possess the items listed in Attachment B.

    28.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that the development of digital devices has radically changed the way that child pornographers obtain, distribute and store their contraband.  Smartphones are digital devices, serve five functions in connection with child pornography: access, production, communication, distribution, and storage.  These devices store child pornography on the physical device and remotely in a service provider's storage facility (i.e. cloud computing).  In this case, I am aware that at least two (2) of digital devices (cellular phone and computer) which connect to the Internet.  Thus there is reason to believe that other devices may have the same capability or maintain records or data related to the above listed charges.

    29.    I am also asking for authorization to copy digital evidence stored on a server (or servers) in another location if a server can be remotely accessed from a computer, other digital

device, located in the Property or Vehicle, authorized to be searched by this warrant.[1] This authorization would permit law enforcement to preserve the integrity of such evidence and prevent it from being tampered with or destroyed. I know, in my training and experience, that so-called "cloud service providers" are quite common. Such providers store data on remote servers that customers can access from their home or any other location with Internet access. Examples of these services include Dropbox, Google Drive, Apple's iCloud, and Microsoft's OneDrive. These services also encompass common "web mail" such as Gmail and Yahoo! mail. Customers can view, alter, create, copy and print data from these remote servers as if it was at the same location as the customer. The customer typically owns and controls the data stored at the remote server while the electronic service provider owns the server on which the data is stored. In my training an experience, law enforcement commonly do not discover that a target of a search warrant is utilizing a cloud service provider until the service of a search warrant takes place.

30. Preservation of "cloud data" accessible by computers targeted by this warrant is paramount. After a connection to a cloud computing service is discovered, it could take law enforcement hours or days to obtain a second search warrant targeted at the service provider operating that service. But it could take mere seconds for data to be deleted from that service

---

[1] The act of copying the data on a remote computer(s) is not a seizure under the Fourth Amendment because it does not interfere with the possessory interest in the data. The data remains intact and unaltered. It remains accessible to the users or any party with shared access. The copying of the data will have no impact on possessory rights and therefore it is not a seizure under the Fourth Amendment. See Arizona v. Hicks (1987) 480 U.S. 321, 324 (recording of serial number on suspected stolen property was not seizure because it did not "meaningfully interfere" with respondent's possessory interest in either the serial number or the equipment); Bills v. Aseltine (6th Cir 1992) 958 F.2d 697, 707 (officer's photographic recording of visual images of scene was not seizure because it did not "meaningfully interfere" with any possessory interest).

remotely from anywhere in the world with an Internet connections. Furthermore, should a connection with a cloud computing service be closed as a result of the powering down and seizing of a computer authorized to be seized by this warrant, encryption mechanisms could prevent such a connection from being reopened and the data accessed in the future. Depending on the cloud service provider, should an open connection to the provider be closed, such encryption may not even be able to be bypassed should a warrant be served for data directly to the provider. If evidence is copied from a cloud computing service as a result of this warrant, it will be noted in the warrant's return when filed with the court. Law enforcement will seek an additional warrant for the search of any such copied data.

31. Storing this information can be intentional, i.e., by saving a photo or video as a file on the device. Digital information, images and videos can also be retained unintentionally, *e.g.*, traces of the path of an electronic communication may be automatically stored in ISP client software. Often, a digital device will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging."

32. Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they record communication in transcript form, show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. Such information is often maintained by the internet service provider client software remotely for long

periods of time until overwritten by other data.

## VI.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33.    As described above and in Attachment B, this application seeks permission to search for records and evidence that might be found on the Premises, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.   Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34.    I submit that if a computer or storage medium is found on the Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

35.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files

were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated

into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However,

taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.    Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

38.    Based on my own experience and consultation with other agents who have been involved in computer searches, searching for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  There are several reasons for this:

     a.    Peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software

which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or documentation and data security devices; and

b.      In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

39.      I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities. I am not aware that any of the materials to be searched and seized from the Property or the Vehicle that are protected materials pursuant to the PPA. If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

## CONCLUSION

40.      Based upon the information provided above, your Affiant respectfully submits that probable cause exists to believe that there has been a violation of Title 18, United States Code, Section 2252, and that evidence of said violation exist at the Target Premises located at **807 University Boulevard, Apartment 104, Jupiter, Florida, 33458**, as more fully described in Attachment A of this affidavit, and in computers or electronic media therein.

41.      Your Affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the Target Premises, and any computers, electronic mobile devices, and

other electronic storage media therein, as fully described in Attachment A for items described in

Attachment B of this affidavit.


*FURTHER YOUR AFFIANT SAYETH NAUGHT.*

Scott Wilson, Special Agent

Federal Bureau of Investigation


Sworn and subscribed before me

this ___ day of November, 2017.

THE HONORABLE JAMES M. HOPKINS

UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. _____17-8504-JMH_____

IN RE: SEALED SEARCH WARRANT FOR
A JUPITER RESIDENCE                    **Filed Under Seal**

_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United
   States Attorney's Office prior to October 14, 2003?    _____Yes    __x__ No

2. Did this matter originate from a matter pending in the Central Region of the United States
   Attorney's Office prior to September 1, 2007?    _____ Yes    __x__ No


Respectfully Submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY


By:    _*s/ Gregory Schiller*_____
       GREGORY SCHILLER
       ASSISTANT UNITED STATES ATTORNEY
       Court No. A5501906
       500 S. Australian Avenue, Suite 400
       West Palm Beach, FL 33401
       Gregory.schiller@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No.    17-8504-JMH

FILED BY _____ D.C.

NOV 30 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

IN RE: SEALED SEARCH WARRANT FOR
A JUPITER RESIDENCE
_____/

**SEALING ORDER**

THIS CAUSE is before the Court on the United States of America's Motion to Seal. Being fully advised, IT IS HEREBY ORDERED that the Application for Search Warrant, Affidavit in Support of Search Warrant, Attachments A and B to the Affidavit, Search Warrant, and Attachments A and B to the Search Warrant, all of which are dated November 30, 2017, this Motion to Seal, and any resulting Order be SEALED until the arrest of any defendant or until further order of this Court.   However, the United States Attorney's Office or any other relevant law enforcement agency may obtain copies of any of the sealed documents for purposes of executing the search warrant.

DONE AND ORDERED in chambers in West Palm Beach, Florida, this _30_ day of November 2017.

HONORABLE JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

cc: AUSA Gregory Schiller

United States v. Wukoson, 18-CR-80166-Middlebrooks, Bates Number 0039